UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION


PAUL LEONARD and JULIE LEONARD                                          PLAINTIFFS


V.                                                CIVIL ACTION NO.1:05CV475 LTS-RHW


NATIONWIDE MUTUAL INSURANCE COMPANY                                      DEFENDANT


### MEMORANDUM OPINION

   This cause came on for trial by the court, sitting without a jury.  Having heard the evidence presented by the parties and having considered the arguments of counsel, I make the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1.   Plaintiffs Paul and Julie Leonard (the Leonards) reside at 1010 Washington Avenue, Pascagoula, Mississippi.

2.   Defendant Nationwide Mutual Insurance Company (Nationwide) is a corporation organized under the laws of Ohio with its principal place of business there.

3.   Jay Fletcher (Fletcher) is a local Nationwide representative who works in the Pascagoula, Mississippi, market.  Fletcher was the Nationwide representative with whom the Leonards did business.  Fletcher was a party defendant to this action when it was filed in the Chancery Court of Jackson County, Mississippi.  After Nationwide removed the case from state court, all claims against Fletcher personally were dismissed.

4.   It is undisputed that the Leonards' residence was extensively damaged during Hurricane Katrina, a powerful storm that made landfall on the Mississippi Gulf Coast on August 29, 2005.  The primary disputes are the cause of the damage, the extent of the damage, and the question whether Nationwide is legally obligated to reimburse the Leonards for any or all of this damage.

5. At the time Hurricane Katrina damaged the Leonards' residence, their property was insured under a homeowners insurance policy issued by Nationwide. This policy has been identified in the record as policy number 63 23 MP 559938, form HO 23A. (the policy or the Nationwide policy)

6. The Leonards' residence was not covered by any policy of flood insurance at the time of the storm. Flood insurance was available prior to Hurricane Katrina under the National Flood Insurance Program. Under federal regulations that apply to this program, residential areas are classified according to the estimated risk of flooding. Areas most prone to flooding are designated Flood Zone A, those less susceptible to flooding are designated Flood Zone B, and those areas even less prone to flooding are designated Flood Zone C. Flood insurance is available to anyone, regardless of which flood zone their residence is situated in.

7. The Nationwide policy in force at the time of Hurricane Katrina contains the following relevant provisions:

   **Insuring Agreement**
   We will provide the insurance described in this policy, which includes the Declarations and attached endorsements or schedules, in return for the premium and fees, and compliance with all the policy provisions.

   \* \* \*

   **Section I**
   **Property Coverages**

   **Coverage Agreement**

   **Coverage A – Dwelling**
   We cover:
   1.   The dwelling on the residence premises used mainly as your private residence, including attached structures . . .

   \* \* \*

   **Coverage B – Other Structures**
   We cover other structures on the residence premises. They must be separated from the dwelling by clear space . . .

   \* \* \*

   **Coverage C – Personal Property**
   We cover personal property owned or used by an insured at the residence premises.

\* \* \*

**Perils Insured Against**
(Section I)
Covered Causes of Loss
Coverage A – Dwelling and
Coverage B – Other Structures
We cover accidental direct physical loss to property described in Coverages A and B except for losses excluded under Section I – Property Exclusions.
Coverage C – Personal Property
We cover accidental direct physical loss to property described in Coverage C caused by the following perils except for losses excluded under Section I – Property Exclusions:

\* \* \*

2. Windstorm or hail.
   Direct loss caused by rain, snow, sleet, sand or dust driven through roof or wall openings made by direct action of wind, hail, or other insured peril is covered.

\* \* \*

**Property Exclusions**
**(Section I)**
1. We do not cover loss to any property resulting directly or indirectly from any of the following. Such a loss is excluded even if another peril or event contributed concurrently or in any sequence to cause the loss.

   \* \* \*

   b) Water or damage caused by water-borne material. Loss resulting from water or water-borne material damage described below is not covered even if other perils contributed, directly or indirectly to cause the loss. Water and water-borne material damage means:
      (1) flood, surface water, waves, tidal waves, overflow of a body of water, spray from these, whether or not driven by wind.

   \* \* \*

   n) Windstorm or hail to any:
      (1) structure, other than a building, including the supports and screens, with a roof-like covering of cloth, metal, plastic or fiberglass, whether or not the structure is attached to a building.

    (2) screens, including their supports, around a pool, patio or other areas.
    (3) property lines and similar walls, including seawalls, greenhouses, hothouses, slathouses, trellis, pergolas, cabanas and outdoor equipment used to service the residence premises.
    (4) structure, including property in or on the structure, which is in whole or part, in or over water.

  2. We do not cover loss to any property resulting directly or indirectly from the following if another excluded peril contributes to the loss:

* * *

   c) Weather conditions, if contributing in any way with an exclusion listed in paragraph 1. of this Section.

8. The evidence presented at trial conclusively established that on August 29, 2005, the entire area surrounding Pascagoula, Mississippi, including the Leonard residence and its surrounding neighborhood, was subjected to violent winds in excess of 100 miles per hour. These winds increased gradually in the early morning hours and reached a peak of intensity between 9:00 a.m. and noon. Water from the Mississippi Sound was driven ashore by the storm, and the water level in the Leonard neighborhood rose to a peak level between 11:00 a.m and noon. At its highest point, this water inundated the Leonard residence to a depth of approximately five feet.

9. The Leonard residence is approximately 12 feet above sea level. This property is 515 feet from the beachfront to the south.

10. The inundation of the ground floor of the Leonards' residence caused extensive damage to the floors, carpets, walls, and personal property situated therein. The second floor of the Leonards' property was not damaged. The physical damage to the roof of the Leonards' property consisted of a small number of broken shingles, and the water-tight integrity of the roof was not breached during the storm. The attached garage on the Leonards' property was also extensively damaged during the storm.

11. The only wind damage on the ground floor of the Leonards' residence was a hole in one window that witnesses described as "golf-ball sized." The exterior of the Leonards' home and the attached garage were soiled by a combination of wind-driven materials and water-borne materials.

12. The doors of the garage were damaged by both wind and water. These doors face west.

13. Following an inspection of the Leonards' property, Nationwide made an estimate of the wind damage sustained during the storm. The Nationwide adjustor found that the wind had caused damage to the shingles of the roof and that a tree was blown down across a fence. The adjustor authorized payment for these items of damage.

14. After applying the $500 deductible, Nationwide tendered a check to the Leonards in the amount of $1,661.17.

15. The Leonards estimated the total damages from the storm to be $130,253.49. This figure included all of the damages to the Leonard residence, regardless of whether the cause of the damage was wind or water. The Leonards' experts identified $47,365.41 in damages that they attribute to wind. This estimate includes the cost of replacing the roof and extensive structural repairs to the garage.

16. During 1989, when the Leonards' property was covered by a homeowners policy issued by Allstate Insurance Company (Allstate), Allstate decided to stop issuing homeowners policies for properties located south of United States Highway 90. The Leonards' policy was, therefore, not renewed by Allstate.

17. In seeking replacement coverage, the Leonards decided to do business with Nationwide through Fletcher. The Leonards purchased their first Nationwide homeowners policy from Fletcher in 1989. This policy was entitled a Deluxe Homeowners Policy, and it was written on a Nationwide Form entitled "Elite II." In 2003, the form of the Nationwide homeowners policy changed. The replacement policy form was designated Form No. HO-23. In 2004, the form changed once again. The new form was designated Form No. HO-23A, and it was this form of the Nationwide homeowners policy that was in force at the time of Hurricane Katrina.

18. During 1999, Paul Leonard met with Fletcher to discuss a proposed increase in the wind/hail deductible that was being instituted by Nationwide with respect to its existing homeowners policies. This was the only relevant conversation between Leonard and Fletcher established by the testimony at trial. I accept Leonard's recollection of this conversation. The proposed increase would have changed the Leonards' deductible for damage caused by wind and hail from $500 to 2% of the insured value of the property. To avoid this change, the Leonards agreed to pay a higher insurance premium. During this conversation, the Leonards also increased their coverage for tools from $2,000 to $3,000, and they increased their coverage for guns from $2,000 to $3,000. During this same conversation, Paul Leonard, who had never experienced flooding to his home

and who did not live in Flood Zone A, asked Fletcher whether he (Leonard) needed to purchase flood insurance coverage. Fletcher told Leonard that he (Leonard) did not need that type of coverage.

19. Fletcher did not carry flood insurance on his own property, and his office assistant, Cindy Byrd Collins, did not carry flood insurance on her property.

20. Fletcher sometimes discouraged his clients from purchasing flood insurance policies. That much is clear from the testimony of a variety of witnesses, including Fletcher's office assistant, Cindy Byrd Collins. There was enough evidence on this point to warrant the conclusion that Fletcher, as a matter of habit and routine, expressed his opinion, when he was asked, that customers should not purchase flood insurance unless they lived in a flood prone area (Flood Zone A) where flood insurance was required in connection with mortgage loans. But between 2001 and the time of Hurricane Katrina, Fletcher sold approximately 187 flood insurance policies in the Pascagoula area. Fletcher sold 12 flood insurance policies in the neighborhood where the Leonards live. There was no testimony from which I can discern the reason Fletcher discouraged some of his clients from purchasing flood insurance policies, the reason Fletcher did not have flood insurance on his own property, or the reason he did sell 187 flood policies in the Pascagoula area and a dozen flood policies in the Leonard neighborhood.

21. Fletcher earns a commission of 15% of the premium for the sale of a homeowners policy and for the sale of a flood insurance policy.

22. Nationwide is among the privately-owned insurers who are qualified to write and sell flood insurance coverage. Nationwide and its agents earn a commission on the premiums for the flood insurance policies it sells, but the losses are ultimately paid by the taxpayers under the National Flood Insurance Program. The terms of the flood policies Nationwide and other private insurers sell are identical, as are the premiums these insurers charge. The premiums and policy terms are set by applicable federal regulations.

23. Applicable federal regulations require flood insurance in certain circumstances. When a federally-insured lender takes a security interest in improvements on real estate situated in an area that has been designated Flood Zone A, the lender must require the borrower to purchase flood insurance for the property. Outside the area designated as Flood Zone A, flood insurance is optional and relatively inexpensive. Maximum coverage of $250,000 for structures and $100,000 for contents is now available (and was available during 2005) for less than $400 per year.

24. According to the testimony of Paul Leonard, his 1999 conversation with Fletcher concerning the question of whether he (Leonard) should purchase a flood

       insurance policy was prompted by the public discussion in the Pascagoula area that followed Hurricane Georges in 1998. These public discussions centered on the fact that standard homeowners insurance policies did not cover flood damage and that a separate flood insurance policy was necessary to protect against flood losses associated with hurricanes.

25. Fletcher was authorized by Nationwide to interpret and explain the coverages provided under Nationwide's policies. Nationwide consistently informed its policy holders that they should direct all questions concerning their coverage to its local agent, in this instance Fletcher.

26. In its billing statements, sent at the time its policies were renewed, Nationwide notified its policy holders, including the Leonards, that the Nationwide homeowners policy did not cover flood loss and that a flood insurance policy was available through the National Flood Insurance Program. Nationwide also advised its policy holders to contact its local agents, in this instance Fletcher, concerning the purchase of flood insurance.

27. Paul Leonard made his inquiry to Fletcher seeking his advice whether it would be advisable for him (Leonard) to purchase a flood insurance policy, and when Fletcher ventured his opinion that the purchase of such a policy was not necessary, Leonard refrained from buying a flood policy. There was no discussion of the reason Fletcher did not believe Leonard needed to buy a flood insurance policy. Leonard apparently inferred that Fletcher's reason for advising him that he did not need a flood policy was that his homeowners policy would cover any and all water damage that might occur during a hurricane. This was an erroneous inference, and one that might have been avoided had either party to the conversation been more articulate in his inquiry or in his response.

28. Fletcher did not materially misrepresent the terms of the Nationwide homeowners policy to the Leonards, and Fletcher did not make any statements which could be reasonably understood to alter the terms of the Nationwide policy. Fletcher did not tell Paul Leonard that he did not need a flood insurance policy because his homeowners policy would cover all water damage that might occur during a hurricane. Leonard apparently inferred that this was the reason Fletcher told him he did not need to buy a flood insurance policy, but Fletcher did not give any reason for his response to Leonard's inquiry.

29. There is no evidence in the record to establish the standard of care applicable to an insurance agent who is asked about the advisability of purchasing flood insurance. Absent proof of this standard of care, there is insufficient evidence to support a finding that Fletcher's statements to Paul Leonard indicating that he (Leonard) did not need to purchase a flood insurance policy breached a standard of care that governed Fletcher's conduct as an insurance agent in these particular circumstances. Fletcher's statement was advisory in nature, and the

statement was made in circumstances in which it was reasonably foreseeable that Leonard would rely upon it.  But there is no evidence to support the conclusion that this statement was made negligently.  The statement embodied Fletcher's opinion, but it did not contain a reason for that opinion.  In my view, Fletcher's statement was not a representation of existing fact, and it was not, in these particular circumstances, a misrepresentation of fact.

30. Paul Leonard inferred, according to my understanding of his testimony, that both wind damage and water damage would be covered under his Nationwide homeowners policy if the wind and water damage occurred during a hurricane. Fletcher did not tell Leonard that, but Leonard inferred as much.  That inference was erroneous, and it was inconsistent with the policy exclusion for water damage.  Paul Leonard knew flood insurance was available and optional, and he testified that his inquiry to Fletcher was prompted by the public discussion of insurance coverages applicable to flooding associated with Hurricane Georges. Thus, Leonard had at least some reason to understand that the water damage exclusion in the Nationwide policy would exclude flooding during a hurricane, and after reading the policy, his reliance on the inference he drew from his conversation with Fletcher was no longer reasonable.

31. Paul Leonard received his Nationwide homeowners policy number 63 23 MP 559938 shortly after it was purchased.  He read the policy, according to his own testimony.  He did not ask Fletcher to clarify or otherwise explain the effect of the water damage exclusion in the Nationwide policy.

32. Storm surge is a phenomenon associated with hurricanes.  Atmospheric conditions and wind forces combine to force tidal waters ashore and temporarily inundate areas of normally dry land.  Storm surge is a type of flooding that is covered by flood policies sold under the National Flood Insurance Program and excluded under standard homeowners policies.

33. There was no testimony that established the standard of care for insurance agents in connection with the sale of flood insurance policies, and there was no testimony that established the standard of care for the training of insurance agents who are authorized to sell and interpret flood insurance policies.

34. The Leonards contend that Fletcher misled them by implying that their Nationwide homeowners policy would cover water damage caused by storm surge flooding.  The evidence was insufficient to support this conclusion. Fletcher gave no explanation for his recommendation that Leonard not purchase a flood insurance policy, and he made no representation that suggested that the water damage exclusion in the Nationwide homeowners policy did not apply in the context of a hurricane.  In fact, Fletcher and Leonard never had any discussion of specific policy provisions and coverages.

35. The Leonards' Nationwide homeowners policy provides coverage for windstorm damage, but its terms specifically exclude coverage for damage caused by water (with the specific and limited exception of water damage caused by rain that enters an insured structure after its watertight integrity has been lost through the action of the wind).  When he read his policy, this exclusion should have put Paul Leonard on notice that further inquiry was necessary concerning his understanding that the policy would cover the risk of rising water during a hurricane.

## CONCLUSIONS OF LAW

1. The Court has subject matter jurisdiction of this action under its diversity jurisdiction, 28 U.S.C. §1332.  The amount in controversy exceeds the jurisdictional minimum.

2. The provisions of the Nationwide policy that exclude coverage for damages caused by water are valid and enforceable terms of the insurance contract. Similar policy terms have been enforced with respect to damage caused by high water associated with hurricanes in many reported decisions.  *Home Insurance Co. v. Sherrill*, 174 F.2d 945 (5th Cir.1949);  *Lunday v. Lititz Mutual Insurance Co.*, 276 So.2d 696 (Miss.1973); *Lititz Mutual Insurance Co. v. Buckley*, 261 So.2d 492 (Miss.1972); *Grace v. Lititz Mutual Insurance Co.*, 257 So.2d 217 (Miss.1972);  *Lititz Mutual Insurance Co. v. Boatner*, 254 So.2d 765 (Miss.1971); *Commercial Union Ins. Co. v. Byrne*, 248 So.2d 777 (Miss.1971); *Fireman's Insurance Co. v. Schulte*, 200 So.2d 240 (Miss.1967).

3. The Nationwide policy provides coverage for damage caused by a windstorm, including damage caused by water that enters an insured building through a breach in the walls or roof caused by the wind.

4. The provisions of the Nationwide policy that purport to exclude coverage entirely for damages caused by a combination of the effects of water (an excluded loss) and damage caused by the effects of wind (a covered loss) are ambiguous.

   There are two provisions that purport to limit recoverable damages where concurrent causes contribute to damage the insured property.  The first of these provisions reads:

   **Property Exclusions
   (Section I)**
   1. We do not cover loss to any property resulting directly or indirectly from any of the following.  Such a loss is excluded even if another peril or event contributed concurrently or in any sequence to cause the loss.

The "loss," "such a loss," and "the loss" referred to in this paragraph, is, in this instance, damage caused by rising water during Hurricane Katrina. These three terms refer to this particular excluded loss, i.e. damage caused by rising water, but this paragraph does not affect the coverage for other losses (covered losses), i.e. damage caused by wind, that occur at or near the same time. Thus, this language does not exclude coverage for different damage, the damage caused by wind, a covered peril, even if the wind damage occurred concurrently or in sequence with the excluded water damage. The wind damage is covered; the water damage is not.

The second of these provisions reads:

2.  We do not cover loss to any property resulting directly or indirectly from the following if another excluded peril contributes to the loss:

    * * *

    c)  Weather conditions, if contributing in any way with an exclusion listed in paragraph 1. of this Section.

Read literally, this provision would exclude any otherwise covered loss, e.g. windstorm damage, in any circumstance where "weather conditions," i.e. the windstorm, combined with an excluded cause of loss, e.g. flooding, to damage the insured property. This reading of the policy would mean that an insured whose dwelling lost its roof in high winds and at the same time suffered an incursion of even an inch of water could recover nothing under his Nationwide policy. Read literally, this provision would exclude all coverage when a windstorm did damage to both an insured dwelling (a covered loss) and adjacent "screens, including their supports, around a pool, patio, or other areas." (an excluded loss). I do not believe this is a reasonable interpretation of the policy.

A windstorm is a weather condition that is specifically included in the coverage of this policy. When the policy is read as a whole, I find that this exclusionary provision is ambiguous–the policy as a whole providing explicitly for windstorm coverage in one section and purportedly excluding the same coverage on the grounds that a windstorm, a "weather condition," and an excluded peril, a flood, occurred at approximately the same time. The most reasonable interpretation for these conflicting policy provisions is that this policy provides coverage for windstorm damage, in accordance with its terms, and that coverage is not negated merely because an excluded peril (in this case storm surge flooding) occurs at or near the same time.

If this second provision were read to exclude wind damage that occurs at or near the time that any excluded water damage occurs, the result would be contrary to well-established Mississippi law. *Home Insurance Co. v. Sherrill*, 174 F.2d 945

(5th Cir.1949); *Lunday v. Lititz Mutual Insurance Co.*, 276 So.2d 696 (Miss.1973); *Lititz Mutual Insurance co. v. Buckley*, 261 So.2d 492 (Miss.1972); ; *Grace v. Lititz Mutual Insurance Co.*, 257 So.2d 217 (Miss.1972); *Lititz Mutual Insurance Co. v. Boatner*, 254 So.2d 765 (Miss.1971); *Commercial Union Ins. Co. v. Byrne*, 248 So.2d 777 (Miss.1971); *Fireman's Insurance Co. v. Schulte*, 200 So.2d 240 (Miss.1967).   This reading of the policy would make the windstorm protection illusory for those who live in areas where the risk of flooding is greatest.

Nationwide seems to recognize this to be the reasonable interpretation of its policy.  Nationwide has not invoked this policy provision to deny coverage to the Leonards for what everyone recognizes to be wind damage.

5. The Leonards have the burden of proving that the insured property was damaged or destroyed by a cause within the insuring language of the policy during the time the policy was in force.  For their structure, this requires the Leonards to prove that there was a direct accidental physical loss to the property.  For their contents, this requires the Leonards to prove that there was a direct physical loss caused by one of the perils enumerated in the policy.

6. Nationwide has the burden of proving what portion of the total loss was attributable to water damage and was thus within the water damage exclusion. *Commercial Union Insurance Co. v. Byrne,* 248 Do.2d 777 (Miss.1971).

7. Under applicable Mississippi law, in a situation such as this, where the insured property sustains damage from both wind (a covered loss) and water (an excluded loss), the insured may recover that portion of the loss which he can prove to have been caused by wind.  *Grace v. Lititz Mutual Insurance Co.* 257 So.2d 217 (Miss.1972).  Nationwide is not responsible for that portion of the damage it can prove was caused by water.  To the extent property is damaged by wind, and is thereafter also damaged by water, the insured can recover that portion of the loss which he can prove to have been caused by wind, but the insurer is not responsible for any additional loss it can prove to have been later caused by water.  *Lititz Mutual Insurance Co. v. Boatner*, 254 So.2d 765 (Miss.1971).

8. There is no evidence to support a finding that this insurance contract should be reformed.  Nationwide provided a copy of the policy to the Leonards, and Paul Leonard read the policy.  Having done so, the plaintiffs are bound by the express terms of the policy, even if their interpretation of the policy was incorrect and even if the inferences they drew from the conversations they had with Fletcher were erroneous.

9. The Nationwide homeowners policy was approved by the Mississippi Department of Insurance, and Nationwide contends that this approval conclusively establishes that the terms of its policies are clear and unambiguous.  Nationwide

reasons that because the Department of Insurance is prohibited from approving any policy provision that is ambiguous, any provision the department approves must be unambiguous. Nationwide does not take into consideration that all human endeavors, including the approval of insurance policies, are subject to error. Under applicable Mississippi law, the construction of the terms of any insurance policy are subject to judicial review, notwithstanding the fact that they have been approved by the Mississippi Department of Insurance.

10. Almost all of the damage to the Leonard residence is attributable to the incursion of water.

There was ample evidence that the storm surge waters severely damaged the walls of the garage and the overhead doors used to drive into and out of the garage. There was also evidence that later in the day, after the storm surge waters had receded and the wind had shifted and begun to come in from the west, the wind inflicted additional damage to these overhead doors. My review of the evidence leads me to the conclusion that these garage doors were damaged enough to be considered a total loss before the time the wind shifted and began to come in from the west. Accordingly, the wind damage to the overhead doors did not enhance or exacerbate the damage these doors had earlier sustained by the force of the storm surge water.

The structural damage to the walls of the garage was more likely than not also caused by the surging water that accompanied the storm. There was no substantial evidence that the garage was structurally damaged before the rising water reached the Leonard property.

None of the damage to the interior of the Leonard property was shown to have been caused by wind. The exterior doors on the first floor were boarded up before the Leonards left their home, and the boards were still in place after they returned. The most likely cause of the damage to these french doors was water, not wind.

There was evidence to support the conclusion that one of the windows on the ground floor of the Leonard residence was damaged by some wind-driven object.

Plaintiffs contended that wind damage to the roof on the Leonard property had voided the roof's warranty, but the evidence showed that the roof's warranty had expired before Hurricane Katrina. The Leonard roof was fifteen years old at the time of the storm, and its watertight integrity was not compromised by the storm. I find that the sum tendered by Nationwide to repair the damage to the shingles of the Leonard roof was adequate to fairly compensate the Leonards for this damage. The evidence did not substantiate the Leonards' allegation that the damage inflicted by Hurricane Katrina to their roof was severe enough to require that the roof be replaced.

>Likewise, I find that the sum tendered by Nationwide was sufficient to compensate the Leonards for damage to their fence.
>
>The evidence indicates that wind-driven debris soiled and scuffed the exterior walls of the Leonard residence and the exterior walls of the garage above the high water mark of five feet.  The Leonards are entitled to compensation for cleaning and for the repairs to those portions of these exterior walls.

11.  The Leonards have met the burden of proving, by a preponderance of the evidence, that the following items of damage to the Leonards' property were caused by wind:

>| | |
>|---|---|
>| window damage (replacement) | $230.76 |
>| expense of cleaning and repairing exterior walls above water line | $997.40 |
>
>The expense for exterior cleaning is based upon a total estimate of $1,994.80. I have allowed one-half of this expense for the portions of the exterior above the water line.  Most of the exterior of the Leonards' buildings is above the water line, but the smaller portion below the water line was more soiled and scuffed than the higher parts of these buildings, and this lower portion will require a disproportionate amount of time to clean.  This conclusion is based upon the photographs that are part of the record.

12.  Nationwide has met the burden of proving, by a preponderance of the evidence, that all other damage to the Leonards' property was caused by water and water-borne materials within provision 1(b) of the Property Exclusions section of the Nationwide policy.

>An appropriate order will be entered, and this case will thereby be dismissed.
>
>Decided this 15th day of August, 2006.
>
>s/ *L. T. Senter, Jr.*
>
>L. T. Senter, Jr.
>Senior Judge